**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                                  :
IN RE MRU HOLDINGS SECURITIES    :      09 Civ. 3807 (RMB)
LITIGATION                                       :
                                                  :      <u>**DECISION & ORDER**</u>
------------------------------------------------------------x

I.    **Introduction**

        This is a putative class action against Edwin J. McGuinn, Jr., Vishal Garg, Yariv Katz,

and Raza Khan ("Individual Defendants"), all senior executive officers and/or directors of MRU

Holdings, Inc. ("MRU" or "the Company"); Merrill Lynch & Co., Inc. ("Merrill"), MRU's

"multi-purpose banker"; and Bagell, Josephs, Levine & Company, LLC ("Bagell"), MRU's

independent auditor (collectively, "Defendants").[1]   Peter Gianoukis ("Gianoukis") and Alan

Borkowski ("Borkowski," and collectively, "Plaintiffs"), who purchased MRU common stock

beginning in May 2008, allege that Defendants violated the federal securities laws, including

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b)

("Section 10(b)"), Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act,

<u>id.</u> § 78t(a) ("Section 20(a)"), by issuing false and incomplete financial statements and press

releases relating, among other things, to MRU's issuance of auction rate securities, and by

employing manipulative and deceptive devices which artificially inflated MRU's stock price.[2]

        Specifically, Plaintiffs claim that between July 9, 2007 and September 19, 2008 ("Class

Period"), "MRU [and Merrill] knew," and yet "hid from MRU's shareholders and the investing

public," that "the Company's reliance on its ability to securitize its student loan pools [through

_____

[1]         MRU is not a party to this litigation.  MRU filed a Chapter 7 bankruptcy petition, <u>see</u> 11
U.S.C. § 701 <u>et seq.</u>, on February 9, 2009 in the Southern District of New York.

[2]         On October 5, 2009, the Court appointed Gianoukis and Borkowski as Lead Plaintiffs,
and the Rosen Law Firm as Lead Plaintiffs' Counsel.  (<u>See</u> Order, dated Oct. 5, 2009 [#16].)

the use of auction rate securities ('ARS')] . . . was . . . exceedingly risky and unrealistic," and

that it would not be possible to generate the level of income from ARS claimed on MRU's

financial statements; that "MRU and [Merrill] manufactured nearly $200 million worth of [ARS]

for [Merrill] to trade in a market in which [Merrill] rigged the prices"; and that Bagell violated

"precepts of fair value accounting" under Generally Accepted Accounting Principles ("GAAP"),

and "closed their eyes to 'red flags,'" such as MRU "management's reckless assumptions" with

respect to income from ARS, by "accept[ing] those assumptions and certif[ying] the Company's

2007 financial statements."  (Second Am. Compl., dated Aug. 20, 2010 ("Complaint" or "SAC")

¶¶ 1, 9, 14, 25, 74, 101, 108, 123, 131, 228, 229.)[3]  The Individual Defendants are also alleged to

have acted as "controlling persons" of MRU within the meaning of Section 20(a).  (SAC ¶ 238.)[4]

On September 24, 2010, Defendants filed a joint motion to dismiss pursuant to Rules 9(b)

and 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), and the Private

Securities Litigation Reform Act of 1995 ("PSLRA"), arguing, among other things, that

Plaintiffs' allegations fail because (1) MRU "more than adequately disclosed the risks and

uncertainties inherent in its valuation" of expected income from ARS; (2) Plaintiffs' allegation

---

[3]       ARS are securities which "pay interest or dividends [to investors] at rates set at auctions
held every 7, 14, 28, or 35 days."  (SAC ¶ 70.)  "[T]he only return on investment for an investor
in auction rate securities [i]s the interest rate or dividend yield set through the auctions."  (SAC
¶ 72.)  In each auction, bidders designate the lowest interest rate they would be willing to accept.
(SAC ¶ 76.)  "[T]he lowest bid rate at which all the shares can be sold . . . establishes the interest
rate."  (SAC ¶ 76.)  An auction fails when "there are not enough orders to buy all of the shares
being sold at the auction."  (SAC ¶ 78.)

[4]       For purposes of this ruling, the Court assumes that Plaintiffs seek to apply the so-called
"group pleading doctrine" with respect to the Individual Defendants for financial disclosures and
press releases issued by non-party MRU.  See, e.g., S.E.C. v. Espuelas, 699 F. Supp. 2d 655,
660–61 (S.D.N.Y. 2010) ("[P]laintiffs can rely on a presumption that statements in prospectuses,
registration statements, annual reports, press releases, or group-published information, are the
collective work of those individuals with direct involvement in the everyday business of the
company." (internal quotation marks omitted)).  In fact, Plaintiffs do not appear otherwise to
attribute any specific misstatements to any of the Individual Defendants.

that the "auction process was misleading and deceptive" because Merrill made purchases on its

own proprietary accounts in order to conceal the riskiness of ARS, fails to pinpoint "even one

specific statement [or omission] by [Merrill] that is alleged to be fraudulent," nor any

manipulative and deceptive device; and (3) the Complaint fails adequately to plead scienter

because neither the Individual Defendants nor Merrill foresaw the "collapse of the ARS market,"

and the Individual Defendants purchased stock (and did not sell stock) during the Class Period.

(Mem. of Law in Supp. of Defs.' Joint Mot. to Dismiss SAC, dated Sept. 24, 2010 ("Defs.

Mem."), at 14–15, 18, 21, 22, 27.)  Defendants also argue that (4) "Plaintiffs identify so-called

'red flags,' . . . but they do not identify a single situation where Bagell did not obtain and review

necessary audit evidence or did not properly investigate an area of concern."  (Defs. Mem. at 32.)

On October 25, 2010, Plaintiffs filed an opposition, arguing, among other things, that

(1) MRU concealed the terms of and the riskiness of ARS in numerous public filings, and

overstated its expected income from ARS by, among other things, understating the "auction rate"

it was required to pay to ARS investors; (2) "[e]very time Merrill traded or abstained from

trading [ARS] for its own account, Merrill traded while in possession of material, non-public

information" which Merrill should have disclosed to the public in "a description of its then-

current material auction practices" posted on Merrill's website in 2006; and (3) the Complaint

adequately pleads scienter because it alleges that the Individual Defendants and Merrill "knew

that the business model they touted to investors was unsustainable," and, "in sharp contrast to the

members of the [putative] Class, no [Individual Defendants] purchased any [MRU] stock for the

last six months before the Class Period ended."  (Mem. of Law in Opp'n to Defs.' Joint Mot. to

Dismiss SAC, dated Oct. 25, 2010 ("Pls. Mem."), at 3, 4, 16–17, 19, 21–22.)  Plaintiffs also

argue that (4) Bagell knew or should have known that "MRU's assumptions [with respect to ARS] were unreasonably optimistic."  (Pls. Mem. at 9.)

On November 9, 2010, Defendants filed a reply.  (See Reply Mem. of Law in Supp. of Defs.' Joint Mot. to Dismiss SAC, dated Nov. 9, 2010 ("Defs. Reply").)  On January 20, 2011, the Court heard oral argument.  (See Tr., dated Jan. 20, 2011.)

**For the reasons stated below, Defendants' motion to dismiss is granted.**

**II.     Background**

For purposes of this motion, the allegations of the Complaint are taken as true.  See Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010).  The Court may consider MRU's public disclosure documents, such as, among others, its July 9, 2007 press release; August 16, 2007 "investor presentation slides"; Annual Report on Form 10-KSB, dated September 28, 2007 for the fiscal year ending June 30, 2007 ("2007 Annual Report"); October 1, 2007 press release; November 14, 2007 10-Q ("November 2007 10-Q") and press release; February 7, 2008 Form 8-K and investor presentation; February 14, 2008 Form 10-Q ("February 2008 10-Q") and press release; May 15, 2008 Form 10-Q ("May 2008 10-Q") and press release; July 3, 2008 press release; July 7, 2008 Form 8-K and investor presentation ; and Annual Report on Form 10-K, dated September 15, 2008 ("2008 Annual Report").  (SAC ¶¶ 164, 165, 167, 171, 173, 176, 179, 182, 187, 192, 195); see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989).

MRU, a Delaware corporation with its executive offices in New York City, was a purchaser, holder, and seller of federal and private student loans.  (SAC ¶¶ 40, 50.)  Its principal sources of revenue were loan origination fees and "interest accrued on its student loan

portfolios." (SAC ¶ 53.) During the Class Period, MRU's common stock was listed on the

NASDAQ under the symbol UNCL. (SAC ¶ 42.)

At all relevant times, Edwin J. McGuinn, Jr. was Chief Executive Officer of MRU and a

member of MRU's board of directors; Vishal Garg was the Chief Financial Officer of MRU and

a member of MRU's board of directors; Yariv Katz was the Vice President and General Counsel

of MRU; and Raza Khan was President of MRU and a member of its board of directors. (SAC

¶¶ 31–34.)

Merrill is a Delaware corporation with its principal offices in North Carolina. (SAC

¶ 38.) During the Class Period, its principal executive offices were located in New York. (SAC

¶ 38.) Bagell is a New Jersey limited liability company with its principal offices in New Jersey.

(SAC ¶ 39.)

**MRU's First Securitization**

In June 2007, MRU conducted the first securitization of its student loans portfolio,

utilizing a special purpose trust ("MRU Trust") that pooled the student loans and issued

securities backed by those loans to investors, including corporations and wealthy individuals.[5]

(See, e.g., Decl. of Mor Wetzler in Supp. of Defs.' Joint Mot. to Dismiss SAC, dated Sept. 24,

2010 ("Wetzler Decl."), Ex. 8 ("New Trouble in Auction Rate Securities," N.Y. Times, dated

Feb. 15, 2008).) This transaction accounted for 58% of MRU's revenue for fiscal year 2007, or

$16.2 million. (SAC ¶¶ 102, 140.) The MRU Trust paid interest to holders of these ARS. (SAC

¶¶ 54–55.) MRU retained an interest in income from the underlying student loans less the

---

[5]     97% of the securities issued as part of MRU's first securitization were ARS sold through
auctions managed by Merrill. (See SAC ¶¶ 63, 73.) Plaintiffs are not alleged to have purchased
these ARS or, in fact, any of MRU's loan-backed securities; rather, their claim is that
Defendants' omissions and manipulation of the ARS market inflated the price of MRU common
stock which Plaintiffs did purchase.

interest it paid out to ARS purchasers (this difference referred to herein as "Residual Interest"). (SAC ¶ 167.)  Accordingly, the lower the interest rate paid by the MRU Trust to purchasers of ARS, the greater the amount of MRU's Residual Interest.  (SAC ¶ 60.)

Plaintiffs contend that MRU overvalued the Residual Interest by understating the projected interest it would be required to pay out on ARS (SAC ¶¶ 122–23 ("MRU knew . . . that it would not be possible for the trust to generate the residual [interest] claimed on its financial statements.")), and that "MRU and Merrill timed the [first securitization] so that the only observable information regarding the interest rate for the [ARS] was the initial purchase price" (SAC ¶ 133–34).

In the section of its 2007 Annual Report entitled "Risk Factors," MRU disclosed, among other things, the following:

- "**We have a history of losses and, because we expect our operating expenses to increase in the future, we may not be profitable in the near term, if ever.**"
- "**We expect to generate a significant portion of our income from gains on the sale of our student loans to securitizations; our financial results and future growth would be adversely affected if we are unable to securitize.**"
- "We are dependent on the securitization markets."
- "The senior tranches of the Company's securitization are auction rate notes."[6]

(2007 Annual Report at 2–3, F-27 (emphases in original).)

Regarding the first securitization, MRU also disclosed that:

- The sale of ARS by the MRU Trust was dependent upon such factors as "the size of the Company's student loan portfolios, the financial ability of the Company to hold this asset, the market at the time of the transaction for this asset class, and the ability of the Company to support the requirements for a sale or securitization transaction."

---

[6]    These "senior tranches" comprise the securities MRU issued as ARS.  (See Pls. Mem. at 16 ("MRU . . . consider[s] 97% of the securities issued to be in the 'senior tranches.'").)

- "[In] August 2007, the rapid deterioration of subprime mortgages and collateralized debt obligations le[d] to disruptions in the money markets which in turn impacted the market for auction rate student loan notes."

- "The component in determining the fair value of the assets received that involves the most judgment is the Residual Interest."

(2007 Annual Report at 21, F-10.)

**Merrill Auctions**

Merrill managed the auction process for MRU (SAC ¶ 73), which Plaintiffs contend were

not "true auctions" (SAC ¶ 84).

> Instead, [Merrill] artificially manipulated the auctions, rigging the prices to
> prevent auctions from failing . . . .  The much-touted liquidity [of ARS] was
> illusory because there were often not enough buy orders to purchase all of the
> ARSs at auction, which, if left unmanipulated, would have resulted in widespread
> auction failures, leaving investors with illiquid, long-term bonds. . . .  In order to
> conceal the inherent illiquidity of the long-term bonds, [Merrill] made purchases
> on its own proprietary accounts to prevent the auctions from failing.

(SAC ¶ 85.)  "[W]hen [Merrill] stopped artificially propping up the market," Plaintiffs allege, the

"[interest] rates were not high enough to compensate investors for the increased liquidity risk."

(SAC ¶ 96.)  Plaintiffs also allege that "Merrill's disclosure [regarding ARS] was inadequate and

deceptive[, containing] actionable misstatements and omissions regarding the undisclosed

interest rate risk to which MRU investors were exposed."  (SAC ¶ 108.)

Plaintiffs also allege that "MRU owed [Merrill] more than $97 million as of March 31,

2007," which debt was secured by MRU's student loans.  (SAC ¶ 10.)  "If MRU could not

uphold its obligations to Merrill," Merrill "would own low-profit student loans that, as an

investment bank, it had neither the desire nor the facilities to own and manage."  (SAC ¶ 11.)

Therefore, Plaintiffs allege, the securitization was undertaken "for the purpose of manufacturing

an asset and a stream of income, as well as removing the student loans from [MRU's] financial

statements."  (SAC ¶ 12; see also Tr. at 5:12-15 (PLS.' COUNSEL: "If Merrill Lynch didn't get

7

that debt paid th[e] relationship manager who had given that hundred . . . million to MRU was no longer going to have a job.  They needed to get that hundred million.").)

**Widespread Auction Failures**

On February 14, 2008, the ARS market suffered a widely publicized collapse with 87% of all ARS auctions failing.  (SAC ¶ 181; see Wetzler Decl., Exs. 7–10 (Reuters, Feb. 15, 2008: "Eighty-seven percent of auction-rate security auctions failed on Thursday as liquidity continued to deteriorate in this $330 billion market"; N.Y. Times, Feb. 15, 2008:  "[T]his week almost 1,000 [auction rate securities] auctions failed, [and] banks also refused to support the auctions"; Financial Times, Feb. 14, 2008:  "The auction-rate securities market is unwinding and most of the market will enter a failed state.").)

None of MRU's auctions failed on February 14, 2008.  However, on that date, MRU disclosed, in its Form 10-Q, that the "recent deterioration in the auction rate market casts doubt upon the potential for market normalization in the near term. . . .  If other broker-dealers fail to support their auctions and liquidity [and] the market worsens further, at a subsequent valuation date the Company might find it necessary to further adjust its assumptions, likely resulting in a further impairment and potential write-down of its Residual Interest."  (February 2008 10-Q at 24.)

**Plaintiffs' First Stock Purchases**

Lead Plaintiffs Gianoukis and Borkowski purchased common stock of MRU in May 2008, following the collapse of the ARS market (see Decl. of Phillip Kim, dated June 19, 2009 ("Kim Decl."), Ex. 2 (Certs. of Gianoukis and Borkowski) [#8]); Gianoukis first purchased on May 30, 2008, and Borkowski first purchased on May 8, 2008 (see Kim Decl., Ex 2).  According to the Complaint, they did so in reliance upon "the false and misleading statements made by

8

[D]efendants, . . . or on the absence of material adverse information that was known to or recklessly disregarded by [D]efendants but not disclosed in public statements."  (SAC ¶ 223.)

### MRU's Second Securitization & Bankruptcy

In July 2008, MRU conducted a second securitization.  (SAC ¶ 192.)  In a July 7, 2008 presentation to the SEC, MRU revealed "that the bonds to be issued in the [second] securitization would be issued at a discount, and that rather than generating revenue, the securitization would result in a significant write-down of assets."  (SAC ¶ 195.)  "[G]iven the cost of funds of securitization," MRU disclosed that "we may need to reduce the carrying basis of our private loan portfolio."  (SAC ¶ 195.)

On September 5, 2008, MRU announced that it would "pause" the origination of student loans as a "result of unprecedented and continued disruptions in the capital markets."  (SAC ¶ 199.)  On February 9, 2009, MRU filed for Chapter 7 bankruptcy.  (SAC ¶ 41.)

### III.   Legal Standard

"To state a claim under [Section] 10(b) and the corresponding Rule 10b-5[b], a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff."  Ganino v. Citizens Util. Co., 228 F.3d 154, 161 (2d Cir. 2000).  "A securities fraud complaint based on misstatements [or omissions] must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.  Allegations that are conclusory or unsupported by factual assertions are insufficient."  ATSI Commc'ns, 493 F.3d at 99 (internal citations omitted).

"The mere identification of a secondary actor as being involved in a transaction, or the public's understanding that a secondary actor 'is at work behind the scenes' are alone insufficient" to state a Rule 10b-5(b) claim.  Pac. Inv. Mgmt. Co. v. Mayer Brown LLP, 603 F.3d 144, 155 (2d Cir. 2010) ("PIMCO").

A claim for market manipulation, under Rule 10b-5(a) or (c), requires a plaintiff to allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." ATSI Commc'ns, 493 F.3d at 101.

## IV.    Analysis

### (1) Alleged Misstatements or Omissions by Individual Defendants

Defendants argue that "MRU did not conceal [the risks and assumptions associated with MRU's Residual Interest and with its securitization financings], it **disclosed** them."  (Defs. Mem. at 2 (emphasis in original).)  Plaintiffs respond that "[t]he true risks . . . were not disclosed or were inadequately and misleadingly disclosed, and thus are actionable."  (Pls. Mem. at 18.)[7]

The alleged misstatements or omissions relating to the Residual Interest and ARS were made in MRU financial disclosures or press releases identified by Plaintiffs.  (See SAC ¶¶ 164, 165, 167, 171, 173, 176, 179, 182, 187, 192 (citing 2007 Annual Report at F-27; July 9, 2007

---

[7]     An action may be brought under Section 10(b) and Rule 10b-5 against officers and directors of a bankrupt corporation.  See In re Osage Exploration Co., 39 B.R. 966, 968 (Bankr. S.D.N.Y. 1984) ("The action has been brought against officers . . .  in their individual capacities and any monies recovered will come directly from these named parties and not from [the bankrupt corporation.]"); see, e.g., In re Monster Worldwide Sec. Litig., 251 F.R.D. 132 (S.D.N.Y. 2008).  Similarly, individual defendants may be found liable under Section 20(a) as control persons even where the (bankrupt) corporation is not a party, "[s]o long as the Complaint adequately alleges the elements of a Rule 10b-5 claim."  Sgalambo v. McKenzie, -- F. Supp. 2d --, 2010 WL 3119349, at *15 n.203 (S.D.N.Y. Aug. 6, 2010).

press release; August 16, 2007 investor presentation slides; October 1, 2007 press release; November 14, 2007 press release).)  Thus, Plaintiffs have satisfied the first three Fed. R. Civ. P. 9(b) requirements.  See In re Globalstar Sec. Litig., No. 01 Civ. 1748, 2003 WL 22953163, at *5 (S.D.N.Y. Dec. 15, 2003) (where "[e]ach of the misrepresentations alleged . . . were made in specifically identified" documents, plaintiffs have successfully "(1) specif[ied] the statements that the plaintiff contends were fraudulent, (2) identif[ied] the speaker, [and] (3) state[d] where and when the statements were made"); ATSI Comm'cns, 493 F.3d at 99.

At the same time, Plaintiffs have failed to plead with particularity "how the statements were false or misleading," In re N. Telecom Ltd. Sec. Litig., No. 93 Civ. 4384, 1994 WL 455534, at *6 (S.D.N.Y. Aug. 22, 1994), as follows:

**Residual Interest**

Plaintiffs fail to allege with particularity any false or misleading statement by the Individual Defendants regarding the Residual Interest, principally because the Individual Defendants disclosed in detail the assumptions upon which the Residual Interest was based and the inherent risks.  (See 2007 Annual Report at 2, F-10, F-27, F-30; November 2007 10-Q at 20; February 2008 10-Q at 22; May 2008 10-Q at 35; 2008 Annual Report at F-35); see also In re Keyspan Sec. Litig., 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("[A]t the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed.") (collecting cases); In re Salomon Analyst Level 3 Litig., 373 F. Supp. 2d 248, 251–52 (S.D.N.Y. 2005); Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 363 (S.D.N.Y. 2007).

For example, the 2007 Annual Report, which was issued 8 months before Plaintiffs purchased MRU stock, stated that:

- "The component in determining the fair value of the assets received that involves the most judgment is the Residual Interest."

- "Because there are no readily available prices for such residual assets, GAAP accounting allows the Company to compute the fair value by discounting projected residual cash flows, which are determined based upon assumptions regarding collateral performance and discount rates that the Company believes are reasonable."

- **"In connection with our recognition of revenue from securitization transactions, if the estimates we make, or the assumptions on which we rely, in preparing our financial statements prove inaccurate, our actual results may vary materially from those reflected in our financial statements.**"

- "[T]he spread to LIBOR of the interest rate required by investors could be more or less than the initial spread to LIBOR at which the transaction was priced."[8]

- "Since [August 2007], similar to the experience of other issuers of student loan auction rate notes, the interest on the Company's student loan auction rate notes has widened to approximately 0.80% over Libor."

- "On a quarterly basis, the Company is required to re-evaluate the fair value of its [Residual] Interest in its securitization.  As such, the Company will take the outlook for the interest rates for auction rate securities into account when next evaluating the fair value of its [Residual] Interest.  Based upon conversations with market makers in auction rate securities, the Company believes that the higher interest rates in the student loan auction rate market are a temporary phenomenon."

(2007 Annual Report at 2, F-10, F-27, F-30 (emphasis in original); SAC ¶ 122.)

At the end of each quarter during the Class Period, MRU also disclosed to investors that the actual auction rate on the ARS had increased.  (See November 2007 10-Q at 20; February 2008 10-Q at 22; May 2008 10-Q at 35; 2008 Annual Report at F-35.)  For example, in November 2007, MRU disclosed that the spread had widened to 0.95% and that "the Company has assumed that these higher spreads will continue through the end of the calendar year and then gradually return to the original projections during 2008."  (November 2007 10-Q at 20.)  In February 2008 (shortly after the ARS market collapse), MRU advised that the spread had

---

[8]     "LIBOR" is the London inter-bank offered rate.  A small "spread to LIBOR" reflects a low auction rate.  Thus, all other things equal, the lower the "spread," the higher the Residual Interest.  (See SAC ¶ 123; see also supra pp. 5–6.)

widened to 1.65% and that "the Company has assumed that these higher spreads will continue through June 2008 and then return over the next twelve months to approximately .275% over LIBOR for the remaining life of the transaction."  (February 2008 10-Q at 22; SAC ¶¶ 167, 182.) In its May 2008 10-Q, MRU stated that the "senior, triple-A-rated auction rate notes in the Company's securitization have never experienced an auction failure but continue to price very near or at the maximum rate (LIBOR + 1.50%)."  (SAC ¶ 187.)  And, in that same report, issued in the same month that Plaintiffs first invested in MRU, the Company disclosed that "assumptions regarding the future cost of funding auction rate notes are highly uncertain and greatly affect the valuation of [MRU's] residual interest."  (May 2008 10-Q at 35; see Kim Decl., Ex. 2.)

These (cautionary) disclosures appear to have been based upon an appraisal of MRU's financial position during an economically difficult timeframe, and "[w]hen read in their entirety, . . . not only bespeak caution, [but] shout it from the rooftops."  Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 360 (2d Cir. 2002); see also Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 9 (2d Cir. 1996) ("Th[e] language fully disclosed the risk of investment and was specific enough to warrant a reasonable investor's attention. . . .  This court has consistently affirmed Rule 12(b)(6) dismissal of securities claims where risks are disclosed in [financial disclosures]."); Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004); San Diego Cnty. Emps. Retirement Ass'n v. Maounis, -- F. Supp. 2d --, 2010 WL 1010012, at *16 (S.D.N.Y. Mar. 15, 2010) ("Plaintiff was warned of the precise risks that it now claims precipitated its loss."); Pew v. Cardarelli, No. 03 Civ. 742, 2005 WL 3817472, at *12 (N.D.N.Y. Mar. 17, 2005) ("The Court concludes that, as a matter of law, no reasonable investor, reading the cautionary statements in context, could have been misled about the future risks inherent in the investment."); see also In

re IBM Corp. Sec. Litig., 163 F.3d 102, 109 (2d Cir. 1998) ("It is well recognized that statements that include cautionary language are usually not the stuff of which securities claims are made." (quoting Hillson Partners Ltd. P'ship v. Adage, Inc., 42 F.3d 204, 218 (4th Cir. 1994)) (internal alterations omitted)).

The Court's conclusion is supported by MRU's representation, made in the 2007 Annual Report, that valuation of the Residual Interest "would rest to a large degree upon the [Individual Defendants'] judgment." Fraternity Fund, 479 F. Supp. 2d at 363; (see 2007 Annual Report at F-10.) In this context, the question is not whether the predicted "values were wrong in some empirical sense," but whether "the totality of the evidence would give rise to a strong inference that management did not give its honest opinion." Id. Because "the challenged statements regarding the future . . . were predictions or opinions, and not guarantees," and because "there is no evidence in the record indicating that [the Individual Defendants] did not genuinely believe" in those predictions, "[P]laintiff[s] ha[ve] failed to identify any misstatements or omissions of material fact which would support a Section 10(b) or Rule 10b-5 claim." IBM, 163 F.3d at 109.

Plaintiffs argue (unpersuasively) that "by the time MRU released [the 2007 Annual Report in September 2007], the spread between LIBOR and the auction rate indices had increased [to 0.8%], [y]et the [C]ompany and its auditors still assumed that the spread would be [0.01%]." (Pls. Mem. at 17.) But, as Defendants pointed out at oral argument, "this 80 basis points, this actual 80 basis points, it is in one of our disclosures . . . . That's where the plaintiffs got it." (Tr. at 15:25–16:6; see 2007 Annual Report at F-30 ("[T]he interest on the Company's student loan auction rate notes has widened to approximately 0.80% over Libor").) Plaintiffs also overlook MRU's disclosure in the 2007 Annual Report that a 0.01% spread was the

"assumption[] used in estimating the fair value of the Residual Interest **at the date of securitization**," in June 2007.  (2007 Annual Report at F-27 (emphasis added).)

And, MRU's subsequent (upward) adjustments of its predicted auction rate, in every quarterly disclosure during the Class Period, demonstrate the Individual Defendants' efforts to make required disclosures, as well as changing assumptions in a turbulent marketplace.  These adjustments do not support the inference (which Plaintiffs draw) that the Individual Defendants at any time lacked a genuine belief in the truth of their assumptions.  (See Pls. Mem. at 17, 27–28.)  "The fact that the interest rates [rose], and that therefore the [Residual Interest] decreased in value as the [disclosures] indicated [it] might, only shows that the investment may have turned out to be a bad one.  To show misrepresentation, the complaint must offer more than allegations that the portfolios failed to perform as predicted."  Olkey, 98 F.3d at 8; see Kramer v. Time Warner Inc., 937 F.2d 767, 776 (2d Cir. 1991) ("It is in the very nature of securities markets that even the most exhaustively researched predictions are fallible.").  "Just because [Plaintiffs'] high risk investment turned out to be an unworkable one does not allow [Plaintiffs] to second-guess [their] investment decision and plead 'fraud by hindsight.'"  Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 703 (2d Cir. 1994) (quoting Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978)).[9]

---

[9]    At most, Plaintiffs have pled that the Individual Defendants were optimistic about MRU's ability to secure financing, but "[m]isguided optimism is not a cause of action."  Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994); see Slayton, 604 F.3d at 776; Rombach, 355 F.3d at 173; Fait v. Regions Fin. Corp., 712 F. Supp. 2d 117, 122 (S.D.N.Y. 2010); In re Citigroup Inc. Sec. Litig., -- F. Supp. 2d --, 2010 WL 4484650, at *34 (S.D.N.Y. Nov. 9, 2010); see also Shields, 25 F.3d at 1129–30 ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.").

**MRU's Securitizations**

Plaintiffs' allegations that the July 8, 2007 press release, the August 16, 2007 investor presentation slides, the October 1, 2007 press release, and the November 14, 2007 press release omitted the fact "that the securities issued in the [2007] securitization were ARSs," and that MRU provided "false reassurances" to the market concerning its reliance on securitization, are also unpersuasive. (SAC ¶¶ 164, 165, 171, 176; Pls. Mem at 10, 18); see Rombach, 355 F.3d at 173; In re Merrill Lynch ARS Litig., 704 F. Supp. 2d 378, 390 (S.D.N.Y. 2010). MRU's reliance on securitization was clearly identified and described for investors, as counsel for Bagell correctly pointed out at oral argument. "[T]here is an entire note devoted to securitization [that] goes on for two pages [in the 2007 Annual Report]" (Tr. at 14:14-15), including statements such as: "**[w]e are dependent on the securitization markets**"; "our financial results and future growth would be adversely affected if we are unable to securitize"; the "senior tranches of the Company's securitization **are auction rate notes**"; "the interest rates on [the MRU Trust's] auction rate notes could be higher than they have been historically, including higher than the maximum rate, which would result in carryover interest, and there could be failed auctions for such notes"; and "[i]lliquidity as a result of failed auctions in the future could result in higher interest rates determined by future auctions, derogatory rating agency action, including ratings downgrades, and impairment charges by the holders of the outstanding auction rate notes, each of which could materially adversely affect future demand for auction rate notes."[10] (2007 Annual Report at 2–3, F-27; May 2008 10-Q at 35–36). On May 15, 2008, contemporaneous

---

[10]     These disclosures concerning, among other things, "carryover interest," the "maximum rate," and potential "ratings downgrades," undercut Plaintiffs' allegations that these specific risks were concealed. (See SAC ¶ 61; Pls. Mem. at 18, 20, 23); see Keyspan, 383 F. Supp. 2d at 377 ("[D]ismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed.").

with Plaintiffs' investment in the Company, MRU advised that "assumptions regarding the future cost of funding auction rate notes are highly uncertain and greatly affect the valuation of [MRU's] residual interest in [MRU's] securitization." (May 2008 10-Q; <u>see</u> Defs. Mem. at 6, 14, 16, 18–19; Wetzler Decl., Exs. 1 at F-27, 2, 4 at 35–36; Kim Decl., Ex. 2.) As Defendants argued, "any investor, any one of the potential plaintiffs . . . could have seen that ARS joint securities were involved in this securitization." (Tr. at 14:19-22); <u>see</u> <u>ECA v. JP Morgan Chase Co.</u>, 553 F.3d 187, 197–98 (2d Cir. 2009); <u>Merrill Lynch ARS</u>, 704 F. Supp. 2d at 397; <u>Citigroup Inc. Sec. Litig.</u>, 2010 WL 4484650, at *34.

### (2) Allegations Against Merrill

Plaintiffs also fail to plead either a material misstatement (in violation of Rule 10b-5(b)) or manipulative practices (in violation of Rule 10b-5(a) and (c)) against Merrill.

### Alleged Misstatements or Omissions

Defendants contend that "Plaintiffs do not—and cannot—allege a fiduciary or other similar relationship of trust and confidence [and, therefore, a duty of disclosure] between Merrill, on the one hand, and investors in MRU stock on the other, based simply on Merrill's participation in the ARS market." (Defs. Mem. at 26). Plaintiffs counter that Merrill had a "legal duty to disclose a description of its then-current material auction practices and procedures available to the general public." (Pls. Mem. at 22–23; <u>see</u> SAC ¶ 107.)

When an allegation of fraud is based upon nondisclosure, as here, "there can be no fraud absent a duty to speak." <u>Chiarella v. United States</u>, 445 U.S. 222, 235 (1980). "Such a duty does not arise from the mere possession of material, nonpublic information." <u>Alexandra Global Master Fund, Ltd. v. Ikon Office Solutions, Inc.</u>, No. 06 Civ 5383, 2007 WL 2077153, at *4 (S.D.N.Y. July 20, 2007). "Rather, a duty to disclose or abstain arises only from a fiduciary or

other similar relationship of trust and confidence between the parties to the transaction." <u>United States v. Chestman</u>, 947 F.2d 551, 565 (2d Cir. 1991) (internal alterations omitted).

Merrill had no such duty.  No such "relationship of trust and confidence" existed between Plaintiffs and Merrill.  <u>See</u> <u>Alexandra</u>, 2007 WL 2077153, at *4.  "The fundamental problem with [P]laintiffs' argument . . . flows from the fact that the duty of disclosure that [Merrill] allegedly breached was a duty owed only to purchasers from [Merrill.]"  <u>In re Parmalat Sec. Litig.</u>, 570 F. Supp. 2d 521, 524 (S.D.N.Y. 2008).  Plaintiffs were purchasers of common stock from MRU, not Merrill.  <u>See</u> <u>supra</u> footnote 5.  And, Plaintiffs provide no support for their contention that a 2006 order by the Securities & Exchange Commission—requiring Merrill to disclose "a description of its then-current material auction practices and procedures to . . . the general public" (SAC ¶¶ 105–07)—created "a specific relationship between the two parties," <u>Chiarella</u>, 445 U.S. at 233.

Assuming <u>arguendo</u> that Merrill owed a duty to Plaintiffs, Plaintiffs do not allege with particularity any misstatements or omissions by Merrill (which violated such duty).  For example, Plaintiffs allege (without citation or quotation) that Merrill "stressed the AAA rating of its ARSs in its marketing effort, billing them as ultraconservative investments."  (SAC ¶ 96.) But, Plaintiffs do not, as Fed. R. Civ. P. 9(b) and the PSLRA require, (1) specify the actual statement(s) that Plaintiffs contend were fraudulent, (2) identify who (at Merrill) made the statement(s), (3) state where and when the statement(s) were made, or (4) explain how or why the statements were fraudulent.  <u>See</u> <u>ATSI Commc'ns</u>, 493 F.3d at 99; <u>Hunt v. Enzo Biochem, Inc.</u>, 530 F. Supp. 2d 580, 601 (S.D.N.Y. 2008) ("The conclusory allegations contained in [the complaint] are insufficiently particularized under Rule 9(b) because they do not identify any specific statements made by [the defendant].");  <u>Asdourian v. Konstantin</u>, 77 F. Supp. 2d 349,

354 (E.D.N.Y. 1999) ("[W]here multiple defendants are involved in the alleged fraud, it is especially important that the fraud be particularized as to each of them."); <u>Felton v. Watson & Co.</u>, 508 F.2d 577, 581 (2d Cir. 1974).[11]   Moreover, as Defendants point out, "Plaintiffs freely concede that [Merrill] disclosed [on its website] that it had the ability to make trades in MRU ARS auctions and that its participation in the ARS auction could affect the clearing price." (Defs. Reply at 5 (citing Pls. Mem. at 4 n.2)); <u>see, e.g.</u>, <u>Debora v. WPP Grp. PLC</u>, No. 91 Civ. 1775, 1994 WL 177291, at *5 (S.D.N.Y. May 5, 1994) ("A complaint fails to state a [Section] 10(b) claim when the alleged omission has actually been disclosed.").

Plaintiffs' unpersuasive allegations of misstatement and/or omission against the Individual Defendants (discussed <u>supra</u> at Part IV.1) offer no support or basis for Merrill's liability under Rule 10b-5(b) as a "secondary actor."   <u>PIMCO</u>, 603 F.3d at 148 n.1 ("[T]he term 'secondary actor' . . . refer[s] to "lawyers . . . , accountants, or other parties who are not employed by the issuing firm whose securities are the subject of allegations of fraud.").   "To be cognizable, a plaintiff's claim against a secondary actor must be based on that actor's own 'articulated statement,' or on statements made by another that have been explicitly adopted by the secondary actor." <u>Id.</u> at 155.   Plaintiffs fail to point out any such "articulated statement" or "explicit[] adopt[ion]" by Merrill, and "do not identify, quote, or otherwise specify a single . . . report [by Merrill], much less a statement contained in one."   (Defs. Reply at 11.)   "The mere identification of [Merrill] as being involved in a transaction [with MRU], or the public's understanding that [Merrill was] 'at work behind the scenes' are alone insufficient."   <u>PIMCO</u>, 603 F.3d at 155 (quoting <u>Lattanzio v. Deloitte & Touche LLP</u>, 476 F.3d 147, 155 (2d Cir. 2007)).

---

[11]      <u>See also</u> <u>Rombach</u>, 355 F.3d at 174 ("[E]xpressions of puffery and corporate optimism do not give rise to securities violations.").

**Alleged Market Manipulation**

Nearly identical claims of market manipulation against Merrill in relation to Merrill's

support for ARS auctions have recently been dismissed in this district.  See In re Merrill Lynch

ARS Litig., 704 F. Supp. 2d 378 (S.D.N.Y. 2010) (Preska, C.J.).  There, as here, Plaintiffs

alleged that Merrill engaged in a scheme to manipulate the ARS market to create the appearance

of a functioning auction market notwithstanding Merrill's routine "intervention [as a bidder for

its own account] to prevent auction failures."  Id. at 383–84.  The Court here reaches the same

conclusion that Judge Preska reached.

Judge Preska concluded (as do I) that disclosures appearing on Merrill's website,

including "that [Merrill] might routinely submit support bids to prevent auction failures, that

[Merrill's] bidding could determine clearing rates, that auction failures were possible especially

if [Merrill] were unable or unwilling to bid, and that failed auctions could result in investors' not

being able to sell any of their securities," preclude Plaintiffs' claim of manipulative acts as a

matter of law.  Merrill Lynch ARS, 704 F. Supp. 2d at 390, 393 ("The market is not misled when

[an ARS] transaction's terms are fully disclosed."); see In re Citigroup ARS Litig., 700 F. Supp.

2d 294, 307 (S.D.N.Y. 2009) ("Here, Defendants disclosed the practices of which Plaintiff now

complains . . . [and] Plaintiff's market manipulation claim must be dismissed."); Vining v.

Oppenheimer Holdings, Inc., No. 08 Civ. 4435, 2010 WL 3825722, at *5–15 (S.D.N.Y. Sept. 29,

2010); In re UBS ARS Litig., No. 08 Civ. 2967, 2010 WL 2541166, at *18 (S.D.N.Y. June 10,

2010); Ashland Inc. v. Morgan Stanley & Co., 700 F. Supp. 2d 453, 464 (S.D.N.Y. 2010); (see

also Wetzler Decl., Ex. 5 (SEC release detailing that a broker-dealer "may submit orders in [a]uctions for its own account" and "might have an advantage over other bidders").)[12]

Although Plaintiffs correctly contend that the court in Merrill Lynch ARS "was not examining the [exact] allegations here" (Pls. Mem. at 21), the class period in that case (from March 23, 2003 through February 13, 2008) encompasses MRU's first securitization described here (in June 2007), and, more importantly, the central component of the alleged scheme in that case was Merrill's intervention to prevent auction failures in every auction for which it served as sole or lead auction dealer. Merrill Lynch ARS, 704 F. Supp. 2d at 384. The cases are sufficiently close and the Merrill Lynch ARS holding is applicable here.

**(3) Scienter**

Even if, arguendo, Plaintiffs had adequately pled misstatements, the Complaint against the Individual Defendants and/or Merrill would be dismissed because Plaintiffs fail adequately to plead scienter.

A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); see Novak v. Kasaks, 216 F.3d 300, 310 (2d Cir. 2000). "Under this heightened pleading standard for scienter, a complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Slayton, 604 F.3d at 766 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007) (internal quotation marks and alterations omitted)). Scienter can be established "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the

---

[12]     In its Complaint and in its brief, Plaintiffs acknowledge Merrill's website disclosures. (See SAC ¶¶ 105–08; Pls. Mem. at 21–23, 28 ("Merrill [on its website] spoke about its ARS to the investing public, which includes, but is not limited to, MRU shareholders.").)

fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99 (citing Ganino, 228 F.3d at 168–69).

**Individual Defendants**

Defendants argue that Plaintiffs "fail[] to allege any 'concrete and personal benefits'" to the Individual Defendants as a result of the alleged fraud beyond those "'possessed by virtually all corporate insiders.'" (Defs. Mem. at 20 (quoting Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001); Novak, 216 F.3d at 307).) Plaintiffs respond that the Individual Defendants "concealed their misdeeds, [and] concealed them so no one would know they were committing securities fraud. That is by definition not a motive shared by all companies and their insiders." (Pls. Mem. at 28.)

Plaintiffs fail to allege a motive, i.e., a "concrete and personal benefit to the [I]ndividual [D]efendants resulting from the [alleged] fraud." Kalnit, 264 F.3d at 139. Rather, theirs appear to have been universal, generalized motives such as the desire to avoid loss to the corporation, to preserve a business relationship, and/or to promote MRU's core business. See id.; Vining, 2010 WL 3825722, at *7 ("[Defendant's] profit motive in perpetuating the ARS market in order to maintain relationships with auction dealers . . . is a generalized motive . . . and is not sufficiently concrete for purposes of inferring scienter." (internal quotation marks and alterations omitted)); Novak, 216 F.3d at 307; In re Fannie Mae 2008 Sec. Litig., -- F. Supp. 2d --, 2010 WL 3825713, at *6 (S.D.N.Y. Sep. 30, 2010); In re Cross Media Mktg. Corp. Sec. Litig., 314 F. Supp. 2d 256, 265 (S.D.N.Y. 2004). And, Plaintiffs' argument that the Individual Defendants were motivated by a desire to conceal the alleged fraud is unsupported in Plaintiffs' papers. (See Pls. Mem. at 28.) It is "rather circular" to say that the Individual Defendants "committed fraud by concealing their intent to commit fraud." MHC Inv. Co. v. Racom Corp., 209 F.R.D. 431, 434 (S.D. Iowa

2002); see Ades v. Deloitte & Touche, 799 F. Supp. 1493, 1499 n.7 (S.D.N.Y. 1992); In re Spiegel, Inc. Sec. Litig., 382 F. Supp. 2d 989, 1026 (N.D. Ill. 2004).  "Clearly, an inference that the defendants knew their statements to be false cannot be based on allegations which are themselves speculative."  Wexner v. First Manhattan Co., 902 F.2d 169, 173 (2d Cir. 1990).

Defendants also contend (persuasively) that Plaintiffs cannot present "'strong circumstantial evidence of conscious misbehavior or recklessness'" where, as here, "the Individual Defendants did not sell a single share of stock during the Class Period."  (Defs. Mem. at 20 (quoting ATSI Commc'ns, 493 F.3d at 99).)  Instead, they increased their holdings such that "the value of purchases by the Individual Defendants during the Class Period **exceeded** the value of the purchases by the Lead Plaintiffs."  (Defs. Mem. at 20–21 (emphasis in original).) Plaintiffs respond that the Individual Defendants' "purchases were not 'substantial,'" and that "[s]tock trading is not dispositive of scienter, but is merely one factor to be considered."  (Pls. Mem. at 27.)[13]

The Individual Defendants' purchase and "retention of the shares . . . [is] inconsistent with the allegation that [they] harbored information that the Company's financial health was in grave jeopardy."  In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003); see Goplen v. 51job, Inc., 453 F. Supp. 2d 759, 772 (S.D.N.Y. 2006) (where defendants held but did not sell stock during the class period); In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (where defendants increased their holdings during the class period);

---

[13]     At oral argument, Plaintiffs contended that "there is no evidence that [the Individual Defendants] were either buyers or sellers [of MRU common stock during the Class Period]" (Tr. 8:25–9:1), but, in their brief, Plaintiffs stated that "[o]nly two (Garg and McGuinn) of the [Individual] Defendants purchased any stock during the Class Period" (Pls. Mem. at 26; see Tr. at 17:18-22 (DEFS.' COUNSEL: "There is an acknowledgement [in Plaintiffs' brief] that these purchases occurred."  COURT: "Well, there is more than an acknowledgment, there is a declaratory statement that they have, by whom, . . . how much, and at what time frame."')).

Tamar v. Mind C.T.I., Ltd., 723 F. Supp. 2d 546, 556 (S.D.N.Y. 2010).  "This trading history cannot support a 'cogent and compelling' inference of fraudulent intent."  Avon Pension Fund v. GlaxoSmithKline PLC, 343 F. App'x 671, 673 (2d Cir. 2009) (quoting Tellabs, 551 U.S. at 324). Rather, the Individual Defendants' purchases of MRU stock during the Class Period "signals only confidence in the future of their company."  Id.

Plaintiffs' allegation that the "Sensitivity Analysis" contained in MRU's 2007 Annual Report was "knowingly misleading because it varied only by plus or minus 5 or 10 basis points" (SAC ¶ 125) does not raise a strong inference of scienter because an equally (if not more) plausible understanding was that the Sensitivity Analysis was a demonstrative and was used to show that the value of the Residual Interest was tied to the rise or fall of the interest rates on MRU's ARS.  (See Tr. at 15:3-12 (the 2007 Annual Report's Sensitivity Analysis "is an illustration [showing that] at 5 to 10 basis points the impact [on Residual Interest] was extreme. . . . This illustration is more than adequate for anyone to be able to figure that out.").)  The Sensitivity Analysis appeared alongside a warning that "[t]hese sensitivities are hypothetical and should be used with caution" and the disclosure that "the interest on the Company's student loan auction rate notes has widened to approximately 0.80% over Libor."  (2007 Annual Report at F-28, F-30); see In re Indep. Energy Holdings PLC Sec. Litig., 154 F. Supp. 2d 741, 758–59 (S.D.N.Y. 2001), abrogated on other grounds.

Plaintiffs' reliance on "confidential witnesses" who (apparently) allege that MRU stopped originating "certain loans" two months "in advance of the Company's public announcement," and that MRU was laying off large numbers of employees in August 2008 (SAC ¶ 207), "must be discounted" because "[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or how [the Court] could take account of plausible

24

opposing inferences.  Perhaps these confidential sources have axes to grind.  Perhaps they are

lying.  Perhaps they don't even exist."  Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 756–57

(7th Cir. 2007) (citing Tellabs, 551 U.S. at 314); accord Campo v. Sears Holding Corp., 371 F.

App'x 212, 216 n.4 (2d Cir. 2010) ("The anonymity of the sources of plaintiffs' factual

allegations concerning scienter frustrates the requirement, announced in Tellabs, that a court

weigh competing inferences to determine whether a complaint gives rise to an inference of

scienter that is 'cogent and at least as compelling as any opposing inference of nonfraudulent

intent.'" (quoting Tellabs, 551 U.S. at 314; citing Higginbotham, 495 F.3d at 757)).

Plaintiffs' allegations fail because they do not support a "strong" or "cogent" inference

that the Individual Defendants acted with "an intent to deceive, manipulate, or defraud," or that

"the danger [of ARS market failure] was either known to [them] or so obvious that [they] must

have been aware of it."  ECA, 553 F.3d at 198; see Citigroup Inc. Sec. Litig., 2010 WL 4484650,

at *34 ("They do not support an inference that either [the defendant] knew ARS auctions would

fail in 2008 or that [the] subsequent valuations of its ARS assets were inaccurate.").  The

Complaint may be said to "give rise to an opposing and compelling inference that Defendants

only engaged in bad (in hindsight) business judgments in connection with ARS, and did not

engage in the alleged conduct with an intent to deceive investors."  Citigroup ARS Litig., 700 F.

Supp. 2d at 305; see Vining, 2010 WL 3825722, at *14 ("This Court finds no reason to deem

Plaintiffs' theory as plausible as the more cogent theory that [defendant] was caught off-guard by

the exceptional turmoil in the [ARS and wider] financial markets and did not consciously or

recklessly defraud investors."); Novak, 216 F.3d at 309 ("[A]llegations that defendants should

have anticipated future events . . . do not suffice to make out a claim of securities fraud.").

**Merrill**

Defendants argue that "[n]owhere does the [Complaint] allege that [Merrill] intended to defraud MRU shareholders.  Instead, Plaintiffs allege that an unparticularized group of [Merrill] subsidiaries supposedly had an 'enormous financial motive' to maximize its fees from its ARS services."  (Defs. Mem. at 28.)  Plaintiffs counter with language in the Complaint that "it was . . . intended[] that the stockholders of [Merrill's] issuer clients would rely on the integrity of the [ARS] markets that [Merrill] operated" (SAC ¶ 228), and argue that "the most cogent and compelling inference is that Merrill knew exactly what it was doing" (Pls. Mem. at 28–29).

Plaintiffs' conclusory allegations regarding Merrill's desire to sell ARS to obtain fees for services in connection with the auctions are insufficient to give rise to a strong inference of scienter.  See Citigroup ARS Litig., 700 F. Supp. 2d at 305 (citing Kalnit, 264 F.3d at 140); Defer LP v. Raymond James Fin., Inc., 654 F. Supp. 2d 204, 217–18 (S.D.N.Y. 2009) ("[T]o perpetuate the artificial ARS market so that [defendant] could earn substantial sales commissions and fees for underwriting the securities and managing ARS auctions" is an insufficient motive. (internal quotation marks omitted)); Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) ("To accept generalized allegation of motive based on a desire to continue to obtain management fees would read the scienter requirement out of the statute."); Vining, 2010 WL 3825722, at *7.

As noted, Plaintiffs' counsel contended at oral argument that Merrill's motive to commit alleged fraud was the repayment of their $97 million loan to MRU.  (See Tr. at 5:12-23.)  But, Plaintiffs fail to explain how "concoct[ing] a scheme" to defraud MRU's shareholders would have made such repayment more likely (Tr. at 5:16), or why Merrill continued to manage MRU's auctions even after MRU's debt had been repaid (see SAC ¶ 13), or why Merrill would

"buy[] up ARS to create the illusion of a liquid market to deceive [P]laintiff[s]"—and thereby "also put itself in an illiquid position," Dow Corning Corp. v. BB&T Corp., No. 09 Civ. 5637, 2010 WL 4860354, at *11 (D.N.J. Nov. 23, 2010) (citing Ashland, 700 F. Supp. 2d at 469); see Vining, 2010 WL 3825722, at *7. "Absent a more coherent motivation, the [Complaint] contains no factual allegations supporting any inference, let alone a strong inference, of scienter." Ashland, 700 F. Supp. 2d at 469; see also ECA, 553 F.3d at 203 ("Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent." (internal quotation marks omitted)).[14]

### (4) Bagell

Defendants argue that "Plaintiffs have not pointed to a single instance where [MRU's] financial statements are not fairly presented or Bagell ignored an actual obligation to disclose," and "do not allege any motive for Bagell to have participated in the supposed fraud." (Defs. Mem. at 32.) Plaintiffs respond that "the allegations cogently and compelling [sic] show that [Bagell] violated GAAP, [generally accepted auditing standards], and ignored red flags such that the scienter pleading requirement is satisfied as to the auditor." (Pls. Mem. at 30.)

Plaintiffs' allegations against Bagell fail. "[T]he standard for pleading auditor scienter is demanding" and is not met here. In re Tremont Sec. Litig., 703 F. Supp. 2d 362, 370 (S.D.N.Y. 2010). "[A]llegations of [violations of GAAP] or accounting irregularities, standing alone, are insufficient to state a securities fraud claim against an independent accountant. Only where such

---

[14]    Because Plaintiffs do not adequately plead either misrepresentation/omission or scienter, the Court need not address Defendants' argument that Plaintiffs do not prove loss causation. (See Defs. Mem. at 23); Vining, 2010 WL 3825722, at *15; Ato Ram, II, Ltd. v. SMC Multimedia Corp., No. 03 Civ. 5569, 2004 WL 744792, at *6 (S.D.N.Y. Apr. 7, 2004). If the Court were arguendo to consider this argument, it could conclude that Plaintiffs had failed to establish a "causal link between the alleged misconduct and the economic harm ultimately suffered by [Plaintiffs]." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172, 174, 177 (2d Cir. 2005).

allegations are coupled with evidence of corresponding fraudulent intent, might they be

sufficient."  In re Doral Fin. Corp. Sec. Litig., 563 F. Supp. 2d 461, 465 (S.D.N.Y. 2008)

(internal quotation marks and citations omitted).  Plaintiffs must allege with particularity that

> [t]he accounting practices were so deficient that the audit amounted to no audit at
> all, or an egregious refusal to see the obvious, or to investigate the doubtful, or
> that the accounting judgments which were made were such that no reasonable
> accountant would have made the same decisions if confronted with the same
> facts.

Fannie Mae, 2010 WL 3825713, at *21.  "[M]ere receipt of compensation and the maintenance

of a profitable professional business relationship for auditing services does not constitute a

sufficient motive for purposes of pleading scienter."  Zucker v. Sasaki, 963 F. Supp. 301, 308

(S.D.N.Y. 1997).

    Although Plaintiffs claim that Bagell ignored alleged "red flags" (e.g., that the 2007

securitization "closed two days before the end of MRU's fiscal year," that "MRU's management

team had not previously issued or caused [ARS] to be issued," that the first securitization

"ma[de] up 58% of MRU's revenue for FYE 2007," and that MRU "desperately needed income"

(SAC ¶¶ 4, 119, 130, 133, 135, 138, 140)), a "shoddy audit" does not establish intent to defraud.

Tremont, 703 F. Supp. 2d at 371.  Rather, Plaintiffs must (but do not) "allege that [Bagell] w[as]

aware of . . . facts indicative of [Defendants'] fraud that [Bagell] consciously disregarded."  Id.

And, "merely alleging that the auditor had access to the information by which it could have

discovered the fraud is not sufficient."  Id.; see In re March & McLennan Cos., Inc. Sec. Litig.,

501 F. Supp. 2d 452, 487 (S.D.N.Y. 2006).  Although Plaintiffs claim (for the first time in their

brief) that Bagell "failed to review [a] closing binder" for MRU's first securitization (Pls. Mem.

at 30; see Defs. Reply at 13), "not a single allegation is included in the [Complaint] indicating

what [this] closing binder said, what Bagell did or failed to do with the information in the closing

binder, or how that would have made any difference given the collapse of the ARS market"

(Defs. Reply at 13); see In re Doral Fin. Corp. Sec. Litig., 563 F. Supp. 2d 461, 465 (S.D.N.Y.

2008) ("[W]here plaintiffs contend that defendants had access to contrary facts, they must

specifically identify the reports or statements containing this information.").

In sum, Plaintiffs fail to allege facts which even suggest that, at the time Bagell certified

the 2007 Annual Report, it "was armed with better information than the many analysts who did

not foresee the collapse of the ARS market in February 2008."  (Defs. Mem. at 33); see In re

Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 398 (S.D.N.Y. 2007) ("Notwithstanding

[allegations that auditor should have noticed overvaluation of assets], scienter has not been

adequately pled.  [Plaintiffs' allegations] would not approximate an actual intent to aid in the

fraud being perpetrated." (internal quotation marks omitted)).

Perhaps reflecting the weakness of their case against Bagell, Plaintiffs contended for the

first time at oral argument that auditor scienter has been adequately pled against Bagell even

though the only improper motive ascribed to Bagell was its desire to uphold "its sterling

reputation . . . [and] for some audit fees."  (Tr. at 11:19-20.)  Plaintiffs appear to contend that the

(clear) rule that "mere receipt of compensation and the maintenance of a profitable professional

business relationship for auditing services does not constitute a sufficient motive for purposes of

pleading scienter," Zucker, 963 F. Supp. at 308, does not apply to Bagell (see Tr. at 11:16–

12:10) and should be reserved for "[accounting] companies with billions of dollars in revenue"

(Tr. at 11:23-24).  Plaintiffs' counsel contended that Bagell was "lucky they ha[d] a handful of

public auditing clients" (Tr. at 11:21-25) and cases like Zucker have "nothing to do with a couple

of guys in a strip mall down in . . . New Jersey" (Tr. at 12:5-7).  Plaintiffs' attempts to diminish

Bagell are unpersuasive and are not supported by any facts in the record.  See SEC v.

Price Waterhouse, 797 F. Supp. 1217, 1242 (S.D.N.Y. 1992) ("It is highly improbable that an accountant would risk surrendering a valuable reputation for honesty and careful work by participating in a fraud merely to obtain increased fees."); Zucker, 963 F. Supp. at 308; In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 289 F. Supp. 2d 416, 428 (S.D.N.Y. 2003); (Tr. at 12:14–16 (DEF. COUNSEL: "To think that [Bagell management] doesn't care about [Bagell's] reputation is possibly one of the most offensive arguments I have ever been presented with.").)

### (5) Section 20(a) Claims

Because Plaintiffs' Section 20(a) claims are "necessarily predicated on a primary violation of securities law [which has not been pled], . . . these secondary claims must also be dismissed." Rombach, 355 F.3d at 177–78.

## V.    Conclusion and Order

For the reasons stated herein, Defendants' joint motion to dismiss the Complaint with prejudice is granted in its entirety.[15] The Clerk of the Court is respectfully requested to close this case.

Dated: February 17, 2011
New York, New York

RICHARD M. BERMAN, U.S.D.J.

---

[15]    The parties have agreed that any dismissal of the Complaint would be with prejudice. (See Tr. of Proceedings before the Ct., dated Dec. 13, 2010.)